## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AIG BAKER TALLAHASSEE, L.L.C. | ) | Case No. 10-07353 |
| and | ) | |
| AIG BAKER TALLAHASSEE | ) | |
| COMMUNITIES, L.L.C. | ) | Case No. 10-07354 |
| | ) | |
| Debtors. | ) | |
| | ) | |

## MOTION FOR ORDER PURSUANT TO SECTIONS 105(a), 361, 363, 541, and 542 OF THE BANKRUPTCY CODE (I) DETERMINING THAT RENTS GENERATED FROM THE DEBTOR'S PROPERTY CONSTITUTE CASH COLLATERAL, (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL IN THE ORDINARY COURSE OF BUSINESS AND (III)) SCHEDULING A FINAL HEARING

COME NOW AIG BAKER TALLAHASSEE, L.L.C. ("Tallahassee" or "Debtor"), and

AIG BAKER TALLAHASSEE COMMUNITIES, L.L.C. ("Tallahassee Communities" or

"Debtor"), each a debtor and debtor-in-possession (collectively, the "Debtors"), and jointly

submit this Motion (the "Motion"), pursuant to Section 105(a), 361, 363, 541, and 542 of Title

11 of the United States Code, 11 U.S.C. §§ 101, *et. seq.* (the "Bankruptcy Code"), for an Order

(i) Determining that the Rents Generated From the Debtors' Property constitute Cash Collateral,

(ii) Authorizing the Debtors to Use Cash Collateral in the Ordinary Course of Business (iii) and

Scheduling a Final Hearing. In support of this Motion, the Debtors respectfully represent as

follows:

### PRELIMINARY STATEMENT

1.    The Debtors operate as part of an integrated business enterprise with centralized

property management. The Debtors are solely owned by AIG Baker Shopping Center Properties,

L.L.C. ("SCP"), and the Debtors' property is managed by SCP's internal management company, AIG Baker Management, L.L.C. ("SCP Management").

2.      The operation and maintenance of the Debtors' business is supported solely by the collection of rents from tenants at its property. These rents constitute cash collateral. Without the use of the rents, the Debtors will be unable to continue to operate and maintain its property during the course of these Chapter 11 cases, which will cause substantial and irreparable harm to the Debtors' estates, their creditors, and the Debtors' ability to continue their business as a going concern.

3.      Accordingly, for the reasons stated herein, the Debtors request entry of an interim and final order determining that the rents constitute cash collateral and authorizing the Debtors to use the cash collateral in the ordinary course of business.

## Bankruptcy Rule 4001 Statement

4.      In accordance with Bankruptcy Rule 4001(b), below is a summary of the Debtors' request for and terms of the proposed use of Cash Collateral (as such term is defined in Section 363(a) of the Bankruptcy Code):

a.      <u>Parties with an Interest in Cash Collateral</u>: Wells Fargo Bank, N.A., successor by merger with Wachovia Bank, N.A. ("Lender") holds or claims to hold an interest in the Cash Collateral.

b.      <u>Use of Cash Collateral</u>: The Debtors propose to use Cash Collateral to, among other things, pay certain operating expenses with respect to the Property (as defined herein), to maintain the Debtors' business operations, to pay the monthly payroll allocation reimbursement and management fee to SCP Management, to pay the costs and expenses of administering the Debtors' estates, and to make monthly payments under the Loan Documents (as defined herein).

c.      <u>Duration of the Use of Cash Collateral</u>: The Debtors propose to use Cash Collateral during the pendency of their Chapter 11 cases.

   d.  <u>Adequate Protection</u>: The Debtors propose to continue to use the Cash Collateral to operate and maintain the Property, which constitutes adequate protection with respect to Lender.

<b><u>JURISDICTION AND VENUE</u></b>

  5.  This Court has jurisdiction over these cases and this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409(a).

<b><u>BACKGROUND</u></b>

  6.  On the date hereof (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. The Debtors are authorized to operate their businesses as debtors-in-possession pursuant to Section 1107 and 1108 of the Bankruptcy Code.

  7.  As of the date of this Motion, no official committee of unsecured creditors has been appointed in these Chapter 11 cases.

  **A.**  **<u>Company Background</u>**

  8.  The Debtors own a master planned community and mixed use development located in Tallahassee, Florida known as Fallschase (the "<u>Property</u>"). The development includes retail, office and residential uses. Tallahassee owns the shopping center portion of the property where anchor tenants include Costco, Wal-Mart and Sportsman's Warehouse. Tallahassee Communities owns the residential portion of the property, which is currently undeveloped.

  9.  The Debtors are solely owned by AIG Baker Shopping Center Properties, LLP ("SCP"). SCP's parent company is AIG Baker Partnership, which is a joint venture between AIG Baker, L.L.C. and Alex Baker Limited Partnership.

  10.  The Debtors are headquartered in and operated out of Birmingham, Alabama, where the business records are maintained.

3

11.     SCP is in the business of buying and developing shopping centers and other mixed use developments, and currently owns at least 15 shopping centers and 35 total developments located around the Country and in various stages of development.

12.     The Debtors are managed by SCP's internal management company, AIG Baker Management, LLP ("SCP Management").     SCP Management also manages the other developments currently owned by SCP.

13.     SCP Management employs and/or contracts with the individuals who manage and maintain the Debtors, which, themselves, have no employees.  The Debtors contribute to SCP Management's employees wages through a property payroll allocation reimbursement and a monthly management fee, which is paid by the Debtors to SCP Management based on a certain percentage of the rents collected from the Debtor's tenants.  The Debtors historically paid a market rate of approximately five percent (5%) of its collective rents to SCP Management as a management fee.[1]

**B.     Debt Structure**

14.     Tallahassee and Tallahassee Communities purchased certain land and, over the next few years, developed the Fallschase shopping center and began development of the residential property.

15.     On or about February 21, 2007, Tallahassee Communities entered into a Loan Agreement (the "Residential Loan Agreement") with Lender.

16.     In connection with the Residential Loan Agreement, Tallahassee Communities executed an Acquisition and Development Note in favor of Lender in the original principal amount of $54,800,000.  Tallahassee Communities further executed a Mortgage on the

---

[1] In connection with certain litigation pending in the Circuit Court for the Second Judicial Circuit in and for Leon County, Florida, the parties agreed to a budget wherein the management fee was reduced to 3.5%.

residential development property to secure that obligation (hereinafter, the Residential Loan Agreement, Acquisition and Development Note and Mortgage may collectively be referred to as the "Residential Loan Documents").

17.     On or about March 1, 2007, Tallahassee entered into a Loan Agreement (the "Center Loan Agreement") with Lender.

18.     In connection with the Center Loan Agreement, Tallahassee executed a Promissory Note in favor of Lender in the original principal amount of $55,000,000 (the "Note"). Tallahassee further executed a Mortgage on the shopping center property to secure that obligation (hereinafter, the Center Loan Agreement, Note and Mortgage may collectively be referred to as the "Center Loan Documents").

### C.     The Cash Management Procedures

19.     The Debtors and certain of its nondebtor affiliates utilize a centralized cash management system (the "Cash Management System") to, among other things, collect and transfer the funds generated by the Debtors and disburse those funds to satisfy the obligations required to operate and maintain the Debtors' business. The Cash Management System has been utilized successfully by the Debtors since its purchase of the Property and by SCP for over 16 years.

20.     The only source of income the Debtors generate is the rents collected each month under the tenant lease agreements. Rents are paid by either check or wire transfer and are deposited or wired into a master account (the "Master Account") at SCP, which is maintained in the name of SCP Management at RBC Bank. Rents collected with respect to other SCP-Owned entities are also deposited into this Master Account.

21.     Although the Debtors do not maintain their separate bank accounts, the Master Account is comprised of several distinct "sub-accounts" that permit SCP Management to

5

properly account for, trace, and allocate the rents and expenditures for each of the SCP-owned LLCs, including the Debtors. Hence, the rents collected for the Debtors are separately tracked and accounted such that only the rents collected by the Debtors and deposited into this Master Account are disbursed by SCP Management toward payment of operating expenses and other costs incurred with respect to the Debtors, including payment to outside service providers and the management fees.

**D.     Events Leading to the Debtors' Chapter 11 Cases**

22.     As set forth above, the monthly rents collected by the Debtors from the tenants at the Property are the Debtors' only source of revenue. The Debtors, through the Cash Management System, historically have used these rents to pay, among other things, debt service and other costs and expenses with respect to the operations and maintenance of the Debtors.

23.     On May 12, 2010, Lender commenced two lawsuits in the Circuit Court for the Second Judicial Circuit in and for Leon County, Florida styled Wells Fargo Bank, N.A. v. AIG Baker Tallahassee, L.L.C., et al., Case no. 10-CA-1720 and Wells Fargo Bank, N.A. v. AIG Baker Tallahassee Communities, L.L.C., et al., Case no. 10-CA-1716, wherein, among other things, Lender sought to foreclose on the Property.

24.     On or about May 28, 2010, Lender filed emergency motions seeking the appointment of a receiver in both cases.

25.     On June 14, 2010, the Debtor and Lender agreed to a Stipulated Order Regarding Payment of Rent into a Designated Bank Account (the "Stipulated Order"), which was entered by the Circuit Court Judge. Under the Stipulated Order, the Debtors were required to turn over net rents (as such term is defined in the Stipulated Order) to the Lender in a bank account designated by the Lender in writing. In exchange, the Lender agreed to continue and the Circuit Court continued the hearing on the receiver motions to a date after June 15, 2010.

26.     Subsequently, on August 12, 2010, the Debtor and Lender agreed to an Agreed Order on Motion to Appoint Receiver ("Agreed Order"), which was entered by the Circuit Court Judge.  In the Agreed Order, the Lender agreed that a receiver would not be appointed at that time.  In exchange, the parties agreed to a budget for the operation of the Property.  On or about September 28, 2010, the Lender filed the actual agreed upon budget with the Circuit Court.

27.     On or about September 7, 2010, Lender filed Motions for Leave to file Amended Complaints in both Circuit Court cases seeking to add the City of Tallahassee, Florida as a defendant in each case due to "the existence of a settlement agreement between AIG and the City of Tallahassee…that may affect the property that is the subject of the Foreclosure Complaint".  On September 22, 2010, the Court entered Orders Granting Plaintiff's Motion for Leave to File Amended Complaint in both cases.

28.     On November 5, 2010, Lender filed for summary judgment, seeking a judgment to foreclose on the Property.  A hearing on the summary judgment motion is scheduled for December 14, 2010.

29.     Without the Property, Debtors will lose their sole source of income and the Debtors and their estates will suffer irreparable harm.

### RELIEF REQUESTED

30.     Pursuant to this Motion, the Debtors seek entry of an interim and final Order, pursuant to Sections 105(a) 361, 363, 541, and 542 of the Bankruptcy Code, (i) determining that the rents generated from the Property constitute Cash Collateral, (ii) authorizing the Debtors to use the Cash Collateral in the ordinary course of its business during the pendency of these Chapter 11 cases and (iii) scheduling a final hearing.

## BASIS FOR RELIEF REQUESTED

### A.    The Rents Constitute Cash Collateral.

31.    The rents generated from the Property are property of the estate, as such term is defined in Section 541 of the Bankruptcy Code.  11 U.S.C. § 541 (defining property of the estate as including "all legal or equitable interests of the debtor in property as of the commencement of the case").  The Debtors possesses the right to collect, use and enjoy the rental income generated by the Property, subject only to the security interest of the Lender.  Accordingly, the rent must be paid directly to the Debtors, as debtor-in-possession, during the pendency of these Chapter 11 cases. 11 U.S.C. § 542(b) (noting that an entity that owes a debt that is property of the estate shall pay such debt to the debtor).

### B.    Use of Cash Collateral

32.    The Debtors require immediate use of the rents generated from the Property.  The rents in this instance consist of the cash on hand (approximately $466,351.11), the rents collected by the Debtors and/or by SCP Management and any other money collected from tenants, wherever located.  In the absence of the use of Cash Collateral, the continued operation of the Debtors' business, even for a limited period of time, would not be possible, and serious and irreparable harm to the Debtors and their estates would occur.  Consequently, the use of Cash Collateral is critical to preserve and maintain the going concern value of the Debtors and will enhance the prospects for a successful reorganization of the Debtors under Chapter 11 of the Bankruptcy Code.

33.    Section 363(c)(2) of the Bankruptcy Code provides that a debtor may not use, sell, or lease cash collateral unless: "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).

34.     It is universally acknowledged that a debtor's cash "is the life's blood of the business," and the bankruptcy court must ensure that such life's blood "is available for use, even if to a limited extent." *In re Mickler*, 9 B.R. 121, 123 (Bankr. M.D. Fla. 1981). Courts typically authorize a debtor to use cash collateral to continue its operations so long as the interests asserted by affected creditors in such cash are adequately protected. Thus, courts are required to balance the protection a debtor seeks to provide with the debtor's need to use cash in its reorganization effort. *Stein v. U. S. Farmers Home Admin. (In re Stein)*, 19 B.R. 458, 459 (Bankr. E.D. Pa. 1982).

35.     Courts have repeatedly recognized that use of cash collateral is appropriate where necessary to preserve a debtor's ability to reorganize and thus maximize the value of an estate for all interested parties. *See, e.g., In re Dynaco*, 162 B.R. 389, 394 (Bankr. D. N.H. 1993) (granting a motion for the use of cash collateral and stating that "the purpose of Chapter 11 is to rehabilitate debtors and generally access to cash collateral is necessary in order to operate a business."); *Chrysler Credit Corp. v. George Ruggiere Chrysler-Plymouth, Inc.*, 727 F.2d 1017, 1020 (11th Cir., 1984) (allowing debtor to use cash collateral over secured creditor's objection after noting that "[w]ithout the availability of cash to meet daily operating expenses such as rent, payroll, utilities, etc., the congressional policy favoring rehabilitation over economic failure would be frustrated."); *In re Stein*, 19 B.R,. at 459 (granting cash collateral motion and declaring that access to cash is imperative for a debtor to operate its business); In *re Constable Plaza Assocs.*, 125 B.R. 98, 105 (Bankr. S.D.N.Y. 1991) (recognizing that the debtor's use of cash collateral to operate and maintain office building would serve to preserve or enhance the value of the building which, in turn, would protect the collateral covered by the lender's mortgage).

36.    In order for the court to authorize the use of cash collateral, it must find the secured creditor is adequately protected. 11 U.S.C. § 363(e). Adequate protection is determined based on the facts and circumstances of each particular case. *In re Pelham Street Assoc.*, 131 B.R. 260, 263, (Bankr. D. R.I. 1991) (recognizing that "adequate protection" under the Code is a "flexible concept, to be tailored to the particular facts of each case."); *In re Karl A. Neise, Inc.*, 16 B.R. 600, 601 (Bankr. S.D. Fla. 1981) (explaining that "[w]hat constitutes adequate protection varies with the facts and circumstances of each particular case."). The principal purpose of adequate protection is to limit a secured creditor's risk that the value of its collateral will decline while being used by the debtor-in-possession. *In re Delta Resources, Inc.*, 54 F.3d 722, 730 (11th Cir. 1995); *In re Grubbs Constr. Co.*, 319 B.R. 698, 711 (Bankr. M.D. Fla. 2005) (instructing that adequate protection should be "fashioned to compensate for the decline in value of the collateral.")

37.    Importantly, the entitlement to, form of, and amount of adequate protection should be based on a showing that the use of cash collateral will not cause the value of a secured creditor's collateral to decrease. *In re Gallegos Research Group, Corp.*, 193 B.R. 577, 584 (Bankr. D. Colo. 1995) ("Despite its form, the entitlement to and measure of adequate protection is always determined by the extent of the anticipated or actual decrease in the value of the secured creditor's collateral during the bankruptcy case . . . .").

38.    Courts have held that where a debtor seeks to use rents constituting a secured party's cash collateral, adequate protection is available if the debtor will use the rents for maintaining the property. *See Federal Nat'l Mortgage Ass 'n v. Dacon Bolingbrook Assocs. Ltd. P'ship.*, 153 B.R. 204 (N.D. Ill. 1993) ("[T]he required adequate protection of rents is satisfied to the extent the Debtor reinvests the rents in the operation and maintenance of the property

because the value of the secured creditor's interest in its collateral will thereby be increased.");
*In re Constable Plaza Assocs.*, 125 B.R. at 105 ("[D]ebtor's plowing back rents solely for the
purpose of maintaining and operating its office building will serve to preserve or enhance the
value of the building which, in turn, will protect the collateral covered by [the] mortgage"); *In re
Pritchard Plaza Assocs. Ltd. P 'ship*, 84 B.R. 289, 302 (Bankr. D. Mass. 1988) (stating that
adequate protection, if required, would be satisfied if the debtor applied rents to the operation
and maintenance of the property); *In re McCombs Properties VI, Ltd.*, 88 B.R. 261, 267 (Bankr.
C.D. Cal. 1988) (holding that rents could be spent to make repairs or renovations that would
increase rent flow even without equity cushion).

39. The standards for authorizing the Debtors to use cash collateral are satisfied in
this instance and the adequate protection being offered is sufficient to protect the interest of the
secured lenders. The use of the rents during the pendency of these Chapter 11 cases to pay
ongoing expenses for the maintenance and operation of the Property will only preserve or
enhance the value of the Property and, as such, will provide adequate protection. Without the
immediate ability to use Cash Collateral to provide for the continued operation, maintenance and
lease up of the Property, the Debtors will lose tenants, will not be able to procure and add new
tenants, and the value of the Property will continue to decline. It is in the best interests of the
Debtors' estates and all creditors to allow the Property to continue to operate. Accordingly, the
Debtors request that the Court authorize the Debtors' use of Cash Collateral during the pendency
of these chapter 11 cases in the manner and for the purposes set forth herein.

## C.  **Request for Immediate Interim Relief.**

40. Bankruptcy Rule 4001(b) provides that a final hearing on a motion to use cash
collateral may not be commenced earlier than 15 days after service of such motion. Similarly,
Bankruptcy Rule 6003 provides that "[e]xcept to the extent that relief is necessary to avoid

immediate and irreparable harm, the court shall not, within 20 days after the filing of the petition grant, among other things, a motion to use, sell, or lease property of the Debtors' estates." Fed. R. Bankr. P. 6003.

41. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a Debtors' estates pending a final hearing.

42. Pursuant to Bankruptcy Rules 4001(b) and 6003, the Debtors request that the Court conduct an expedited preliminary hearing on the Motion[2] and (i) authorize the Debtors to use the Cash Collateral in the manner and for the purposes set forth herein, and (ii) schedule a final hearing to consider the relief requested herein.

43. Absent authorization from the Court to use Cash Collateral on an interim basis pending a final hearing, the Debtors will be immediately and irreparably harmed. As set forth above, the Debtors' ability to use Cash Collateral is critical to its ability to operate its business and preserve value. Without immediate liquidity provided by the use of Cash Collateral, the Debtors will simply be unable to conduct normal business operations, will be unable to pay basic operating expenses, and will suffer a precipitous loss in value to the detriment of all parties in interest.

44. Accordingly, the Debtors request that, pending a final hearing, the Court schedule an interim hearing as soon as practicable to consider the Debtors' request for authorization to use Cash Collateral in the manner and for the purposes set forth herein.

45. For the foregoing reasons, the Debtors believe that granting the relief requested herein in appropriate and in the best interests of its estate.

---

[2] In accordance with this Court's procedures, the Debtors has filed a separate motion for expedited hearing.

## NOTICE AND NO PRIOR REQUEST

46.     Notice of this Motion has been provided to the (i) Office of the United States Bankruptcy Administrator for the Northern District of Alabama, Southern Division, (ii) counsel for the Lender, (iii) Debtors' unsecured creditors, and (iv) District Director of the Internal Revenue Service for the Northern District of Alabama. In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

47.     No previous request for the relief sought herein has been made in this bankruptcy case to this or any other court.

## CONCLUSION

WHEREFORE, the Debtors respectfully request this Court enter an order, substantially in the form of Exhibit A attached hereto, (i) determining that rents generated from the Property constitute Cash Collateral, (ii) authorizing the Debtors to use Cash Collateral, including all postpetition rents generated with respect to the Property, in the ordinary course of business and (iii) granting the Debtors such other and further relief as the Court deems just and proper.

_____
LEE R. BENTON (ASB 8421-E63L)

Proposed Counsel for the Debtors in Possession

OF COUNSEL:
BENTON & CENTENO, LLP
2019 Third Avenue North
Birmingham, Alabama 35203
Telephone: (205) 278-8000
Facsimile: (205) 278-8008
Email: lbenton@bcattys.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing has been served upon the below-listed persons/entities and the attached Creditor Matrix by depositing a copy of same in the United States mail, properly addressed, first-class postage prepaid, on this _14_ day of December, 2010.

```
Bankruptcy Administrator
United States Bankruptcy Court
Northern District of Alabama
1800 5th Avenue North
Birmingham, Alabama  35203
```

LEE R. BENTON (ASB 8421-E63L)
*Proposed Counsel for the Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **In re:** | ) | **Chapter 11** |
| | ) | |
| **AIG BAKER TALLAHASSEE, L.L.C.** | ) | **Case No. 10-**07353 |
| **and** | ) | |
| **AIG BAKER TALLAHASSEE** | ) | |
| **COMMUNITIES, L.L.C.** | ) | **Case No. 10-** 07354 |
| | ) | |
| **Debtors.** | ) | |

**ORDER PURSUANT TO SECTIONS 105(a), 361,
363, 541, and 542 OF THE BANKRUPTCY CODE (I) DETERMINING
THAT RENTS GENERATED FROM THE DEBTOR'S PROPERTY
CONSTITUTE CASH COLLATERAL, (II) AUTHORIZING THE
DEBTOR TO USE CASH COLLATERAL IN THE ORDINARY
COURSE OF BUSINESS AND (III) SCHEDULING A FINAL HEARING**

This matter came before the Court on the Debtors' Motion for an Order (i) Determining that the Rents Generated From the Debtors' Property Constitute Cash Collateral, (ii) Authorizing the Debtors to Use Cash Collateral in the Ordinary Course of Business and (iii) Scheduling a Final Hearing (the "Motion"),[3] filed by the above-captioned debtors and debtors-in-possession (the "Debtors"); the Court having reviewed the Motion and having heard the statements of counsel regarding the relief requested in the Motion at hearing before the Court; the Court having subject matter jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; this being a core proceeding pursuant to 28 U.S.C. § 157(b); due and proper notice of the Motion having been provided; and the relief requested therein being in the best interests of the Debtors and their respective estates; and after due deliberation and sufficient cause appearing therefore;

---

[3] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

1.     The Motion is GRANTED.

2.     All rents generated from the Property, whether prior to or after the Petition Date, constitute Cash Collateral.

3.     From and after the Petition Date, the Debtors are authorized to collect and have paid directly to it all rents and other amounts due under the Leases from all tenants of Debtors.

4.     The Debtors are authorized to use Cash Collateral for the purposes set forth in the Motion for the period from the Petition Date through _____, 2011. This authorization includes using Cash Collateral to (i) pay necessary operating expenses with respect to the Property, (ii) maintain the Debtors' business operations and (iii) pay the costs and expenses of administering the Debtors' estates.

5.     The Debtors shall continue to operate and maintain its business and the Property, which maintenance constitutes adequate protection with respect to the Lender.

6.     A final hearing to consider the relief requested in the Motion is scheduled for _____, 2011 at _____ a.m. (Central Time), at which time the Court may authorize the continued use of Cash Collateral.

8.     Notwithstanding anything to the contrary in the Bankruptcy Rules, the terms and conditions of this Order are immediately effective and enforceable upon entry of this Order.

9.     This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Order.

SO ORDERED, this _____ day of _____, 2010.

_____
UNITED STATES BANKRUPTCY COURT JUDGE

Prepared and Presented by:

Lee R. Benton, Esq.
Benton & Centeno, LLP
2019 Third Avenue North
Birmingham, AL 35203
Telephone:     (205) 278-8000
Facsimile:     (205) 278-8008
Email: lbenton@bcattys.com

Proposed Counsel for the
Debtors in Possession